

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00152-CV

_____

MIYUKI EMMA RYAN POYDRAS, Appellant

V.

TRAVIS ERVING POYDRAS, Appellee

---

On Appeal from the 367th District Court
Denton County, Texas
Trial Court No. 20-10758-367

---

Before Sudderth, C.J.; Bassel and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

In four issues, Appellant Miyuki Emma Ryan Poydras (Wife) challenges a final decree of divorce rendered in the divorce proceeding between herself and Appellee Travis Erving Poydras (Husband). We dispose of the issues raised by Wife as follows:

- The trial court did not abuse its discretion by failing to render a judgment making Husband liable to Wife for the balance of a loan that Husband had agreed to "take" but which had been paid by the time of trial;

- the trial court did not abuse its discretion by not ordering Husband to reimburse Wife for her contributions to pay off the loan that Husband had agreed to "take";

- the trial court did not err by failing to clarify the divorce decree to reflect the statements that the trial court had made in an email that it had sent to the parties because the email embodied the trial court's ruling to Husband's petition for writ of habeas corpus and because the decree was not so ambiguous that it required clarification; and

- the trial court did not abuse its discretion by not awarding Wife attorney's fees pursuant to the terms of the parties' premarital agreement or under various provisions of the Family Code, neither of which compelled awarding attorney's fees to Wife.

We affirm the final decree of divorce rendered by the trial court.

## II. Background

Wife petitioned for divorce. Two children were born of the marriage; they are disabled and require specialized care.

This matter was tried to the trial court. After a hearing on the form that the decree should take, the trial court rendered a final decree of divorce. The final divorce decree rendered by the trial court detailed the custody rights of Husband and Wife with respect to the children and how the trial court divided the estate of the parties. Few of the issues resolved by the decree are disputed on appeal. We will save a detailed explication of the facts until our discussion of the specific issues raised by Wife on appeal.

After the trial court rendered its decree, Wife requested findings of fact and conclusions of law, which the trial court made. Wife requested additional and amended findings and conclusions, and the trial court responded by issuing amended findings and conclusions. Wife also filed a motion for new trial and a motion to modify, correct, or reform the judgment. The trial court conducted a hearing on these motions and denied them.

Before entry of the final decree, Husband filed a petition for writ of habeas corpus seeking a ruling on which parent was entitled to possession of the parties' children. The trial court rendered an order addressing the issue raised in the petition.

## III. Analysis

### A.    Standard of review

In many of the issues raised by Wife, we apply an abuse-of-discretion standard of review.   Our court has previously outlined the application of that standard in family-law matters as follows:

> In family-law cases, the traditional sufficiency standards of review overlap with the abuse-of-discretion standard of review; therefore, legal and factual insufficiency are not independent grounds of error but are relevant factors in our assessment of whether the trial court abused its discretion.  *Neyland v. Raymond*, 324 S.W.3d 646, 649 (Tex. App.—Fort Worth 2010, no pet.).  To determine whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we must determine (1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether the trial court erred in its application of that discretion.  *Id.* The applicable sufficiency review comes into play with regard to the first question. *Id.*
>
>     The sufficiency standards of review we apply are the same for a trial court's findings of fact as for a jury's answers to questions in the court's charge; the findings are reviewable for legal and factual sufficiency of the evidence to support them.  *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009).  Evidence is legally insufficient to support a trial court's finding of fact only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact.  *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) [(op. on reh'g)]. . . .   In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.  *Cent. Ready Mix Concrete*

*Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

*Logsdon v. Logsdon*, No. 02-14-00045-CV, 2015 WL 7690034, at *3 (Tex. App.—Fort Worth Nov. 25, 2015, no pet.) (mem. op.).

## B. The SoFi loan

Wife's first two issues focus on a loan that was obtained by Wife from SoFi Lending Corporation in March 2018 for the principal amount of $65,000.00.[1] The loan was payable in thirty-six monthly installments and was apparently paid off as scheduled in March 2021, which was after the divorce proceeding was filed at the end of December 2020.

### 1. We reject Wife's first issue in which she claims that the trial court should have awarded her a judgment against Husband for $65,215.09 due to his agreeing to "take" the SoFi loan.

In her first issue, Wife questions

[w]hether the trial court erred when it failed to award [her] a judgment against Husband for $65,215.09[] when Husband admitted in writing that he was taking responsibility for the debt, Husband testified that he [had] knowingly [taken] on responsibility for the debt, the trial court mistakenly conflated two separate debts, and the parties [had] entered

---

[1]There was a second loan from SoFi obtained by Husband that is not in dispute.

into a pre[]marital agreement stating that earnings received during the marriage would remain separate property.

We construe this issue to mean that Wife challenges the trial court's division of the estate of the parties because the trial court did not enforce a one-sentence handwritten agreement that Husband would "take" the SoFi loan. Wife argues that the trial court should have implemented her view of Husband's obligation by decreeing that Husband owed Wife the amount that she had paid to discharge the SoFi loan and by ordering him to pay that amount to Wife. If we are interpreting Wife's argument correctly, she is contending that the trial court divested her of her separate property by not recognizing the SoFi debt obligation that she sees as existing between her and Husband.

Two reasons demonstrate why the trial court did not abuse its discretion by not rendering the judgment against Husband that Wife sought. First, there was no valid postmarital agreement dealing with payment of the loan. Second, in essence, Wife argues that the trial court erred by not imposing an obligation on Husband to pay her for the balance due on the SoFi loan because it failed to adopt her views of issues on which there were factual disputes. The trial court, however, was not bound by Wife's views on these contested issues.

6

### a. We set forth the terms of the parties' premarital agreement, the background of the SoFi loan, and the evidence at trial about the payment of the loan.

The parties' premarital agreement contained a provision governing which accounts would be used to pay particular debts and liabilities acquired during marriage as follows, with the first subsection referencing a joint account to be used to pay common living expenses and the second subsection requiring a spouse's separate account to be used for expenses that were personal to that spouse:

> 1. During our marriage we may maintain one or more accounts subject to the following: (a) We shall contribute to a joint account out of which our common living expenses shall be paid, including mortgage payments, property taxes on residences, property owner's insurance, gardeners' fees, maintenance expenses, food, entertainment, joint travel expenses, and all other reasonable and necessary expenses for our joint maintenance. (b) From our respective separate accounts, we shall pay the proportionate share of federal and state income taxes, clothing, objects of personal adornment, automobile payments, automobile maintenance and operating expenses, separate travel, and other expenses personal to each of us.

The premarital agreement also provides that each spouse's earnings remain his or her separate property pursuant to the premarital agreement's provision that "[t]he earnings and accumulations resulting from either of our personal services, skills, efforts, and work, together with all property acquired or income derived from same, shall be the separate, non-marital property of the person to whom the earnings and income are attributable."

The operative terms of the handwritten agreement that Wife claimed made Husband liable to her for the balance paid to discharge the SoFi loan consists of one

7

handwritten page. The agreement begins by stating that Husband relinquishes any claim that he has to Wife's "earnings during our marriage" and lists several sources of Wife's income to which Husband is foregoing any claim. Next, the agreement has a single sentence referencing the SoFi loan, which states, "I agree to take the debt of the $65,215.09 SoFi Personal Loan [acct #] that [Wife] had to take out because I chose not to work for 18 months." Wife did not sign the handwritten agreement.

As noted, the SoFi loan was repaid shortly after the suit for divorce was filed. The parties disputed how the loan was repaid and the effect of the handwritten agreement. Wife claimed that she had paid the loan, that Husband was obligated to but had not paid her back for the amount that she had paid to discharge the loan, and that she wanted to be repaid "by virtue" of the handwritten agreement. Wife denied that the loan had been paid by any agreement between her and Husband.

Husband agreed that he had not repaid Wife for the SoFi loan but offered a different view of how the loan was to be repaid. The following exchange occurred between Wife's counsel and Husband regarding Husband's view of the effect of the statement in the handwritten agreement that he had agreed to "take" the SoFi loan:

> Q. [Wife's counsel] So -- so when it says (reading) ["]I agree to take the debt of [$]65,215,["] you didn't take that as you were responsible for it?
>
> A. No, that's not what I did. I -- I took it as I'm responsible, but we paid it together while we were married.

Husband later elaborated on the method that he claimed was used to repay the SoFi loan:

8

Q. And so -- and with regard to that loan, how was it paid?

A. So at the time, . . . my whole check was going direct deposited into the joint account. I mean, you could pay all the bills. So she could use whatever money is in the joint account to pay the bills as well. And if she needed to dip into any other accounts, she would pay it. So that's how everything got paid, so it wasn't just being mixed and mingled.

Husband also testified that the premarital agreement provided for the joint account from which payments were made on the SoFi loan. The provision of the premarital agreement referencing the joint account is quoted above.

Wife's inventory and appraisement addressed the SoFi loan while Husband did not introduce an inventory and appraisement, and his requested relief did not mention the SoFi loan. Wife's inventory presented her view of how the SoFi loan and the handwritten agreement (which she deems to be a postmarital agreement) should be characterized:

11. Liabilities of [Wife's] Separate Estate:

Name of creditor: [Husband]
Account number: Unknown
Current balance (as of September 20, 2021): $65,215.09 for [SoFi] Personal loan ([Acct #]). Loan has been paid in full by [Wife]. As per post[]marital agreement, [Husband] has agreed to pay for entire [SoFi] Personal loan ([Acct #]) in the amount of $65,215.09. *If court finds that this loan was repaid with community funds[,] then [Husband] should reimburse the community estate[.]*

. . . .

13. Liabilities of [Husband's] Separate Estate:

$65,215.09 for [SoFi] Personal loan ([Acct #]). Loan has been paid in full by [Wife]. As per post[]marital agreement, [Husband] has agreed to

pay for entire [SoFi] Personal loan ([Acct #]) in the amount of $65,215.09.

> **b. The trial court did not abuse its discretion in making a "just and right" division of the estate of the parties by failing to order Husband to repay Wife for the balance of the SoFi loan.**

The parties agree on the basic principles that govern the trial court's powers to make a "just and right" division of their estate. *See* Tex. Fam. Code Ann. § 7.001 ("In a decree of divorce or annulment, the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage."). For example, a trial court should consider the liabilities of the parties in making a "just and right" division of the estate of the parties. *In re S.A.A.*, 279 S.W.3d 853, 857 (Tex. App.—Dallas 2009, no pet.). Though a trial court cannot free a party from his or her obligation to a creditor, "the divorce court ha[s] discretion in dividing property between the spouses[] and to provide that one spouse should pay the debt of the other." *Blake v. Amoco Fed. Credit Union*, 900 S.W.2d 108, 111–12 (Tex. App.—Houston [14th Dist.] 1995, no writ). It is also a truism that "[i]t is . . . unconstitutional for a trial court to divest a party of [his or her] separate property by awarding any portion of it to the other party in a divorce proceeding." *Blair v. Blair*, 642 S.W.3d 150, 156 (Tex. App.—El Paso 2021, no pet.) (op. on reh'g).

10

Wife's view of why the trial court was bound to award her a judgment for the balance of the SoFi loan is summarized in four of the seven points that she offers to support her argument:

First and foremost, the trial court failed to enforce Husband's agreement, contained in his March 29, 2018[] [handwritten] statement, that he was taking sole responsibility for paying the debt. The trial court's error is compounded by the fact that Husband admitted under cross-examination at the [f]inal [h]earing on October 20, 2021, that when he wrote and signed the March 29, 2018[] statement, **he intended to accept responsibility for the $65,215.09 debt**.

Second, the trial court failed to recognize the ongoing existence of the debt, instead referring to it as "the alleged debt[."]

Third, the trial court erred when it found that[] " . . . the parties testified that both parties [had] paid the debt[,"] despite Wife['s] testimony expressly disputing that Husband [had] played any role in her paying SoFi Lending Corp.

Fourth, the trial court's [a]mended [f]indings of [f]act and [c]onclusions of [l]aw filed March 21, 2022, contains a significant factual error when it states that ". . . the parties testified that both parties [had] paid the debt" when Wife clearly testified that was not the case. Wife had filed her [r]equest for [a]dditional or [a]mended [f]indings of [f]act and [c]onclusions of [l]aw on March 9, 2022, that contained the correct facts. [Record references omitted.]

Initially, these points diverge from how Wife characterized the handwritten agreement in her inventory and appraisement. In the inventory and appraisement, Wife characterized the agreement as a "post[]marital agreement." But it appears that the parties' *premarital* agreement set the SoFi loan as an obligation personal to Wife, thus making it one that she was obligated to pay from her separate accounts. As Husband points out, the Family Code provides that "[a]fter marriage, a premarital

11

agreement may be amended or revoked only by a written agreement signed by the parties." *See* Tex. Fam. Code Ann. § 4.005. Further, the parties' premarital agreement provides that "[a] modification or waiver of any of the provisions of this Agreement shall be effective only if made in writing and executed with the same formality as this Agreement." It is uncontested that Wife did not sign the handwritten agreement. Thus, that agreement is not a modification under the terms of the premarital agreement and is not a valid postmarital agreement.

On the basis of the points raised by Wife, it now appears that the lynchpin of Wife's argument is that she conclusively proved that the handwritten agreement created a new debt between her and Husband requiring him to pay her the balance of the SoFi loan. We disagree.

The handwritten agreement is of the barest bones. Its operative provision runs to a total of six words: "I agree to *take* the debt." [Emphasis added.] We interpret non-technical language, such as the word "take," according to its plain meaning. *RPC, Inc. v. CTMI, LLC*, 606 S.W.3d 469, 484 (Tex. App.—Fort Worth 2020, pet. denied) (mem. op.). Various definitions of "take" may apply to its use in the handwritten agreement: (1) "to impose upon oneself"; (2) "to adopt as one's own"; (3) "to accept the burden or consequences of." *Take*, https://www.merriam-webster.com/dictionary/take (last visited Jan. 12, 2023). We accept that the handwritten agreement means that Husband took some responsibility for the debt. But what the agreement leaves unanswered is what means Husband would use to carry out that responsibility.

12

Other questions raised by the handwritten agreement include the following: when would he start making the payments—if so, for how long; was he agreeing (as Wife argues) to indemnify her for payments that she made to discharge the debt; or was there some other unspecified means by which he would "take" the debt?

Here, all we know about what "take" means is from the parties' testimony about how they implemented the agreement. Under these circumstances, the parties' own actions are the clearest indication of what they viewed as required performance because

> [n]o principle of interpretation of contracts is more firmly established than that great, if not controlling, weight should be given by the court to the interpretation placed upon a contract of uncertain meaning by the parties themselves. Courts rightfully assume that parties to a contract are in the best position to know what was intended by the language employed.

*Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979); *see also Elliott v. Rockwood Vill. Partners, Ltd.*, No. 03-12-00298-CV, 2012 WL 6554826, at *5 (Tex. App.—Austin Dec. 12, 2012, no pet.) (mem. op.) ("It is well settled that if a contract is ambiguous, a court should adopt the construction of the instrument placed on it by the parties themselves unless there is clear language in the instrument indicating a contrary intent."); *Morris v. Morris*, No. 04-96-00629-CV, 1997 WL 563191, at *2–3 (Tex. App.—San Antonio Sept. 10, 1997, pet. denied) (not designated for publication) (applying the principle to property-settlement agreement that "[a]cts of the parties done in the course of performance, which indicate the construction that the parties themselves put on the

contract, may properly be considered by the court in interpreting an agreement that is doubtful or ambiguous"). Questions of intent as expressed in an ambiguous agreement and questions of whether parties performed a contract are ones of fact. *Perthuis v. Baylor Miraca Genetics Labs., LLC*, 645 S.W.3d 228, 235 (Tex. 2022) (stating that if agreement is ambiguous, then question of parties' intent is one of fact); *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 718 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (stating that questions of what duties exist under a contract are usually ones of law while disputes concerning the failure of a party to comply with its duties are one of fact).

And here, the record contains only a smattering of testimony as to what the parties viewed as the appropriate performance of the obligations created by the handwritten agreement. Wife's testimony offered little insight into how Husband was to perform his obligation to "take" the debt. She denied that the SoFi loan had been paid off by the parties' agreement and argued that she should be paid "[b]ased upon the agreement that ha[d] been admitted into evidence" and was "asking that [she] be repaid by virtue of what [Husband had] signed." As we have outlined, Husband's testimony—though not the clearest—was that the parties had paid the SoFi note payments together during the marriage with the mechanism being that it was repaid from the joint account into which he had deposited his earnings. We do not know how many payments were made using this method versus how many were made by Wife from funds that she claimed to be her separate property. All we know is that the

14

SoFi obligation no longer existed by the time of trial as it was paid off a few months after the divorce proceeding was filed.

With these premises established, we must look to the conflicting evidence to determine how the parties intended to perform Husband's agreement to "take" the SoFi debt. We reject the foundational points of Wife's argument that we quoted above because of the following:

- The trial court did not fail to enforce Husband's agreement; the trial court reconciled the conflicting evidence and then exercised its discretion to not impose an obligation on Husband that it apparently found did not exist or was not adequately proven to exist.

- We are unsure of the import of Wife's argument that the trial court may have described the SoFi loan as an "alleged debt"; this appears to be simply criticism of the trial court for not adopting Wife's view of a contested issue.

- Wife's claim that the trial court was bound to accept her testimony "expressly disputing that Husband [had] played any role in paying" the SoFi loan betrays a fundamental misunderstanding that we cannot second-guess the trial court in how it resolved questions of fact that turn on witness credibility.

- Wife's attack—that the trial court misspoke when it stated in its amended findings that "the parties testified that both parties [had] paid the debt"—is

15

not sufficient to establish that the trial court committed a harmful error. The statement may be inaccurate, but it is buried in a host of reasons why the trial court ultimately decided a different issue—why Wife was not entitled to reimbursement. The statement is at most on an immaterial evidentiary issue, and a trial court's error in resolving an immaterial evidentiary issue is harmless.[2]

At bottom, and no matter how strenuously Wife contends otherwise, the trial court was confronted with fact issues that turned on weighing the testimony in making its determination that the handwritten agreement did not create a new debt

---

[2]As the Texarkana court recently explained,

Initially, we note that a "trial court need only enter findings . . . on ultimate or controlling issues." *In re Marriage of Grossnickle*, 115 S.W.3d 238, 253 (Tex. App.—Texarkana 2003, no pet.). "An ultimate fact issue is 'one that is essential to the cause of action and has a direct effect on the judgment.'" *Wood v. Wiggins*, No. 01-18-00630-CV, 2021 WL 5312652, at *21 (Tex. App.—Houston [1st Dist.] Nov. 16, 2021, pet. [denied]) (quoting *Cooke Cnty. Tax Appraisal Dist. v. Teel*, 129 S.W.3d 724, 731 (Tex. App.—Fort Worth 2004, no pet.) [(op. on reh'g)]). "An evidentiary issue is one the court may consider in deciding the controlling issue but is not controlling in and of itself." *Id.* (citing *Cooke Cnty.*, 129 S.W.3d at 731). "We may only reverse the trial court's judgment if the court made an erroneous finding on an ultimate fact issue; immaterial findings are harmless and are not grounds for reversal." *Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 822 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (citing *Castro v. Castro*, No. 14-11-01087-CV, 2013 WL 1928742, at *5 (Tex. App.—Houston [14th Dist.] May 9, 2013, no pet.) (mem. op.)).

*Osprin II, LLC v. TX 1111 Rusk GP LLC*, No. 06-21-00085-CV, 2022 WL 2541932, at *10 n.22 (Tex. App.—Texarkana July 8, 2022, pets. filed) (mem. op.).

between Husband and Wife; as factfinder, the trial court occupies precisely that role and thus is not a matter in which we can second-guess the trial court:

> The trial court is tasked with determining witnesses'[] credibility and the weight their testimony carries. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The trial court, as the fact[]finder, determines who to believe, how to resolve inconsistencies in witness testimony, and what testimony to credit. *Gomez v. Gomez*, 632 S.W.3d 4, 9–10 (Tex. App.—El Paso 2020, no pet.); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). "The trial court in a divorce case has the opportunity to observe the parties on the witness stand, determine their credibility, evaluate their needs and potentials, both social and economic." *Murff v. Murff*, 615 S.W.2d 696, 700 (Tex. 1981). The appellate court is not to override the trial court's credibility determinations or which testimony it chose to believe, as the trial court heard, watched, and assessed witness testimony.

*Glenn v. Glenn*, No. 08-21-00059-CV, 2022 WL 3645070, at *4 (Tex. App.—El Paso Aug. 24, 2022, pet. filed). Wife may not agree with whom the trial court believed, but a disagreement with how the trial court performed its role as factfinder is not a basis to claim that the trial court abused its discretion.

For the sake of thoroughness, we also address the remaining points that Wife relies on to argue that the trial court was bound to award her a judgment against Husband on the SoFi loan. As the following quotes show, these points turn on the claim that the trial court failed to give proper weight to statements that she had made in her inventory and appraisement and Husband's failure to file an inventory:

> Fifth, the trial court erred when it failed to award and divide . . . Husband's liability of $65,215.09 owed to . . . Wife based on the evidence admitted in the form of . . . Wife's [i]nventory and [a]ppraisement.

17

Sixth, the trial court erred when it failed to award and divide . . . Husband's liability of $65,215.09 owed to . . . Wife based on the evidence admitted in the form of . . . Wife's [p]roposed [p]roperty [d]ivision.

Seventh, the trial court erred when it failed to award and divide . . . Husband's liability of $65,215.09 owed to . . . Wife based on lack of evidence admitted from . . . Husband regarding the debt and Husband's failure to provide an [i]nventory and [a]ppraisement as evidence regarding the debt at the final trial in this case. [Record references omitted.]

Once again, we fail to grasp why Wife views her statements as conclusive. The factfinder is not compelled to believe uncontroverted testimony that is suspicious or that comes from an interested or biased source. *Hamilton v. Hamilton*, No. 02-19-00211-CV, 2020 WL 6498528, at *4 (Tex. App.—Fort Worth Nov. 5, 2020, no pet.) (mem. op.). Going one step further, as the factfinder, the trial court may believe or disbelieve uncontradicted, unimpeached testimony from disinterested witnesses. *Id.* Of course, the factfinder's credibility decisions must be reasonable. *Id.* Only uncontradicted statements in inventories and appraisements may be relied on to determine the sufficiency of the evidence because "[a] sworn inventory and appraisement entered into evidence at trial, and uncontradicted by the opposing party, constitutes sufficient evidence on which to base the court's valuation of the parties' property." 1 Tex. Prac. Guide Family Law § 4:153. Also, statements in an inventory and appraisement may also constitute judicial admissions. *Dutton v. Dutton*, 18 S.W.3d

18

849, 853 (Tex. App.—Eastland 2000, pet. denied). But a judicial admission is a statement used against a party's opponent.[3]

Wife's claims in the inventory about the SoFi loan were certainly controverted. Nor do we understand how Wife can claim that her own statements in the inventory created an admission that would bar the trial court from considering conflicting evidence in the record. Further, we do not understand what impact Husband's failure to file an inventory should have. Wife's inventory did not establish those facts as a matter of law just because Husband did not file an inventory. Because she was an interested and biased party, the trial court could disregard or discount the information presented in Wife's inventory. Even had Husband filed one, he would not have listed the SoFi loan because he contended that the loan had been paid and thus no longer existed as a matter to be dealt with in the division of the estate of the parties.

---

[3]As the Eastland court has noted,

> Judicial admissions estop the party who made them from challenging their truth. Five conditions must occur before a party's admission is conclusive against him: (1) the declaration relied upon must have been made in the course of a judicial proceeding; (2) the declaration was contrary to an essential fact embraced in the theory of recovery or defense asserted by the party; (3) the statement was deliberate, clear, and unequivocal; (4) giving conclusive effect to the declaration would not run contrary to public policy; and (5) the declaration related to a fact upon which a judgment for the opposing party was based.

*Dutton*, 18 S.W.3d at 853.

We overrule Wife's first issue claiming that the trial court should have awarded her a judgment against Husband for $65,215.09 due to his agreeing to "take" the SoFi loan.

### 2. We reject Wife's contention that she is entitled to reimbursement for the amount that she paid to discharge the SoFi loan.

In her second issue, Wife contends that the trial court should have ordered Husband to reimburse her for the balance that she had paid to discharge the SoFi loan. The trial court did not abuse its discretion by denying Wife's reimbursement claim. The trial court's equitable determination of the reimbursement claim again turned on the resolution of factual issues consigned to the trial court to resolve. And Wife, herself, characterized the funds obtained from the SoFi loan as being for living expenses—a claim for which there is no right of reimbursement.

Section 3.402 of the Family Code governs claims for reimbursement. Tex. Fam. Code Ann. § 3.402. Wife's brief references a specific subsection of Section 3.402 as the basis for her claim; that section provides "a claim for reimbursement includes: (1) payment by one marital estate of the unsecured liabilities of another marital estate." *Id.* § 3.402(a)(1). As with any reimbursement claim, Wife bore the burden of proof to establish that an expenditure for which reimbursement was sought was actually made and that the expenditure is reimbursable. *In re Marriage of Wells*, No. 12-21-00152-CV, 2022 WL 3724724, at *3 (Tex. App.—Tyler Aug. 30, 2022, no pet.) (mem. op.) (citing *Vallone v. Vallone*, 644 S.W.2d 455, 459 (Tex. 1982)). Specifically,

20

the party asserting a reimbursement claim carries a three-pronged burden: "(1) that a contribution was made by one marital estate to another, (2) that the contribution was reimbursable, and (3) the value of the contribution." *Id.* at *4. And the Family Code also provides that certain classes of claims are "nonreimbursable." *See* Tex. Fam. Code Ann. § 3.409. An expenditure for "living expenses of a spouse" is not reimbursable. *Id.* § 3.409(2).

The Family Code also explicitly provides that the trial court "shall resolve a claim for reimbursement by using equitable principles." *Id.* § 3.402(b). As we have recently held,

> A trial court's discretion in evaluating a claim for reimbursement is equally as broad as its discretion in making a "just and right" division of the marital estate. We must give great latitude to the trial court's application of equitable principles to value a claim for reimbursement. If there is some evidence of substantive and probative character to support the trial court's decision, there is no abuse of discretion.

*Barber v. Barber*, No. 02-21-00291-CV, 2022 WL 4105363, at *2 (Tex. App.—Fort Worth Sept. 8, 2022, no pet.) (mem. op.) (citations omitted) (citing *Penick v. Penick*, 783 S.W.2d 194, 198 (Tex. 1988)).

Thus, Wife must ground her claim on a theory that one marital estate paid the claim of another marital estate—in this case, that Wife's separate estate paid a debt owed by Husband's separate estate. Though Wife was the one who borrowed the money from SoFi, she apparently claims that the debt transmogrified from a debt that she was liable to pay to one that Husband was liable to pay due to the handwritten

agreement in which he stated that he would "take" the loan. As with her prior arguments, Wife is steadfast in her assertion that her separate funds were used to pay the debt "because the [p]remarital [a]greement entered into by both parties on January 11, 2017, established that each party's earnings and accumulations throughout the marriage would remain the separate property of the incurring spouse. *Thus, the only funds available to Wife were her separate funds.*" [Emphasis added.] [Record references omitted.] However, we note once again that the record does not support her contention that the only funds available or used to pay the SoFi loan were Wife's earnings; this is fatal to Wife's argument. As highlighted above in the outline of the record, Husband testified that the loan was paid from a joint checking account into which he had deposited his earnings. As Wife failed to do in her prior argument, she never acknowledges the testimony about the source of payment of the SoFi loan or shows how anything in the record rebutted Husband's testimony.

Nor does she explain how she has carried her burden of proof to show the value of her reimbursement claim when she did not account for Husband's funds that were used to pay the loan. Indeed, the trial court highlighted this failing in its amended finding that "[n]either party admitted evidence reflecting the monies used to pay the alleged debt. Neither party admitted bank statements or identified the character or source of the monies used to pay the alleged debt. Neither party submitted a tracing report evidencing or supporting the payoff of the alleged debt." Thus, Wife does not explain why the trial court's action in denying her reimbursement

22

claim was inequitable when she failed to carry the burden to quantify the claim and based it on an assertion—her separate funds were used to pay the loan—that is contested in the record.

Beyond these failings, Wife then argues herself into making a claim for expenditures that are not reimbursable. To demonstrate the inequity of denying the reimbursement claim, Wife argues that

> [f]rom an equity standpoint, this seems like an easy call. Husband admitted in writing that Wife took out a loan specifically to offset the impact of Husband's choice to remain unemployed for eighteen (18) months. Given that the loan represented a significant injection of cash into the household, and Husband's extended period of voluntary unemployment meant he wasn't bringing home his normal income, it's not a leap to assume the loan was necessary because Husband chose to leave Wife as the sole bread[]winner. [Record references omitted.]

Later in her brief, she relies on the claim that the money was needed to pay family expenses to support an argument that Husband's separate estate would be unjustly enriched if he were not required to reimburse Wife for the loan's payment:

> The third question is whether unjust enrichment will occur if Husband is not required to repay Wife. Consider that if Husband does not repay Wife, she will have spent $65,215.09 of her separate money to bridge the financial gap caused when Husband chose not to work for eighteen (18) months. That reads like a classic case of unjust enrichment.

Again, as we noted previously, the parties' premarital agreement contemplated the maintenance of the joint "account out of which [the parties'] common living expenses shall be paid," and there is evidence that at least a portion of the SoFi loan was paid from that account.

Thus, Wife predicates her reimbursement claim on an argument that the loan funds were used to pay living expenses, and the record supports this view. Such a claim is not reimbursable. *See* Tex. Fam. Code Ann. § 3.409(2); *see also Mora v. Mora*, No. 04-12-00638-CV, 2014 WL 769441, at *3 (Tex. App.—San Antonio Feb. 26, 2014, no pet.) (mem. op.) ("In this case, however, the trial court did not order reimbursement, nor could it have entered such an order, because 'one contribution that is nonreimbursable is expenditures for the living expenses of a spouse.'" (quoting *In re Marriage of Collier*, 419 S.W.3d 390, 405 (Tex. App.—Amarillo 2011, no pet.), and citing Tex. Fam. Code Ann. § 3.409(2))). Further, from the perspective of carrying her burden of proof, even if all the funds were not used to pay living expenses, Wife does not segregate the amounts for us.

We overrule Wife's second issue.

**C.    We reject Wife's contention that the trial court erred by failing to incorporate a clarification of a provision in the divorce decree dealing with possession of the parties' children or that the decree is ambiguous in one of its provisions addressing possession of the parties' children.**

We next turn to Wife's third issue that appears to argue that the trial court erred by not clarifying a possession order in the decree to reflect statements made by the trial court in an email that it later sent the parties. The two subissues under the issue are disjointed, and we are frankly unsure exactly what Wife is complaining about. We lack jurisdiction over the first subissue because it appears that Wife is asking us to review an order addressing a petition for writ of habeas corpus, which is not

reviewable on appeal. We reject the second subissue that appears to be a claim that the decree is ambiguous because we do not conclude it to be.

### 1. We set forth the involved history of the email that is the source of the complaint in Wife's third issue.

After negotiations between the parties and the trial court's resolution of issues upon which the parties could not agree, the trial court rendered its final decree of divorce. Relevant to this discussion, the decree provided for alternating weeks of possession of the parties' children beginning on a date certain. Then, in the section dealing with holiday and spring-break possession, the decree provided that

> [n]otwithstanding the alternating weekly periods of possession, [Wife] and [Husband] shall have the right to possession of the children as follows:
>
> . . . .
>
> 6. Spring Vacation in Even-Numbered Years—In even-numbered years, [Husband] shall have the right to possession of the children beginning at 6:00 p.m. on the day the children are dismissed from school for the school's spring vacation and ending at 6:00 p.m. the day before school resumes after that vacation.

After the trial court signed the decree, Wife filed a motion for new trial that, among other points, challenged the decree's possession provisions but only to the extent that she asserted that the decree deviated from standard possession in its summer-possession schedule. Wife also filed a motion to modify, correct, and reform the judgment, lodging the same challenge to summer possession as was made in her

25

motion for new trial. Thus, neither motion had anything to do with holiday and spring-break possession.

Two months after the final decree was signed, however, Husband filed a petition for writ of habeas corpus alleging that he was entitled to possession of the children because he had possession of them for spring break and because the week following spring break was an alternating week for which he was also entitled to possession under the decree. Wife responded to the petition on the same day that it was filed and challenged Husband's interpretation of the decree by arguing in essence that after Husband had possession for spring break, the alternating weekly provision of the decree reset, and thus, Wife was entitled to possession the week after spring break.

The parties indicate that the trial court held a non-evidentiary hearing on the habeas petition, but there is no reporter's record of that hearing in our record. The day after the filing of the habeas petition and the response filed by Wife, the trial court sent an email to the parties that read as follows:

This is my clarification:

1) Start with the week of Jan. 14, 2022. That week starts [Wife's] possession and the alternating weeks forever.

2) [Husband's] week begins Jan[.] 21[] and has alternating weeks thereafter.

3) The alternating weeks continue throughout summer for each of them.

4)   Christmas, Thanksgiving[,] Mother's [Day,] and Father's [Day] are specified and will also interrupt, but not change, the alternating weeks.

5)   *Continuing the theory that visitation is one week on and one off, they will never "restart*[*."*]

6)   [Husband] will always get spring break in even numbered years. [Wife] will always have spring break in odd years.

Hope that helps.  If not, set up a phone conference.  [Emphasis added.]

The trial court filed the email of record.

Having addressed Husband's habeas, the trial court next held a hearing on Wife's motion for new trial and motion to modify, correct, or reform.  During that hearing, Wife argued the trial court should incorporate its email into an order, apparently in the form of an amended divorce decree.  Husband's view was that the email was not a clarification of the decree but was a ruling on the petition for writ of habeas corpus by stating who was entitled to possession of the children.  At the end of the hearing, the trial court denied Wife's motion for new trial and motion to modify, correct, or reform and later signed orders reflecting those rulings.  The trial court then told the parties to look at a recent case dealing with emails as orders and to come back if that issue needed to be addressed.

Shortly after the hearing, Wife filed a "Motion for Judgment of Final Decree of Divorce with Clarification."  Though somewhat opaque, the motion does not appear to argue that the trial court rendered a new judgment with its email but instead asks the trial court to render a new decree (a draft of which was attached to the motion);

27

Wife asserted that the new decree that she submitted incorporated the provisions of the trial court's email. The motion urged the trial court to sign the new decree while the trial court had the plenary jurisdiction to do so. On the same date as this motion, Wife filed her notice of appeal. The notice of appeal referenced the final decree and then also asserted that she was appealing "the clarification rendition of March 24, 2022," i.e., the email.

The next series of steps were kicked off by Husband's filing a "Motion to Enter Order on Petition for Habeas Corpus" that asked the trial court to sign an order on the habeas petition that incorporated the terms of the trial court's March 24 email. Wife objected to the order, asking once again that the provisions of the email be incorporated into a final decree, or if the email were not a rendition of an order, that the trial court make the email a rendition.

The trial court then conducted another hearing at which the parties continued to argue about whether the email was a ruling on the habeas petition or some type of additional rendition in the divorce proceeding. During the hearing, the trial court repeatedly reiterated that it did not view its email as changing the terms of the final decree; in the trial court's words, "I don't think I changed the order at all."

The trial court then signed a corrected order[4] on the habeas petition that reduced the email to a formal order by stating,

---

[4]This order corrected the order that the trial court had signed the day prior— May 3, 2022.

The [c]ourt finds that [Wife's] week of possession begins on Friday, January 14, 2022, and alternates every other Friday thereafter, forever.

The [c]ourt finds that [Husband's] week of possession begins on Friday, January 21, 2022, and alternates every other Friday thereafter, forever.

The [c]ourt finds that the alternating weeks of possession continue throughout summer for each parent conservator.

The [c]ourt finds that the Spring Break, Christmas, Thanksgiving, Mother's Day[,] and Father's Day periods of possession are specified in the Final Decree of Divorce dated January 21, 2022, and shall interrupt, but not change, the alternating weeks of possession.

The order concluded by granting Husband the habeas relief that he had requested and further stated, "PRONOUNCED AND RENDERED on March 24, 2022, [the date of the court's email,] and further noted in the [c]ourt's docket sheet on the same date[] but signed on May 4, 2022."

### 2.  We lack jurisdiction over Wife's first subissue.

In her first subissue of her third issue, Wife argues that in some way the trial court erred "by not adding the terms of its clarifying ruling to the Final Decree of Divorce" or "by incorporating the terms of it's [sic] clarification ruling into the Corrected Order on Petition for Habeas without an evidentiary hearing."  We view Wife's challenge as being an attack on the trial court's ruling on Husband's petition for writ of habeas corpus, which is not an appealable order.

We initially note one of our struggles with Wife's argument.  Her argument begins with four pages of "legal authority."  Most of this section of Wife's brief is

29

copied verbatim and without attribution from a section of *O'Connor's Texas Rules Civil Trials* dealing with whether letters may constitute a rendition. John Zavitsanos, *O'Connor's Texas Rules Civil Trials* § 3.4 (2021). Such an unfocused presentation of the law without any attempt to tie the material quoted to whatever issue Wife is attempting to raise is of little help to the court in understanding or resolving Wife's arguments.

Next as our outline of the history of the issues shows, the trial court viewed its email as a ruling on Husband's petition for writ of habeas corpus. Indeed, as the corrected order signed by the court noted, the trial court categorized the email that Wife claims should be incorporated into the decree as a ruling on the habeas petition.

Quite simply, "[a]n order granting habeas[ ]corpus relief is not an appealable order." *Ex parte E.A.B.*, No. 14-21-00288-CV, 2022 WL 1087751, at *1 (Tex. App.— Houston [14th Dist.] Apr. 12, 2022, no pet.) (per curiam) (mem. op.) (citing *Gray v. Rankin*, 594 S.W.2d 409, 409 (Tex. 1980)). As the Corpus Christi–Edinburg Court of Appeals has explained,

> The Texas Family Code authorizes an appeal "by any party to a suit from a final order rendered under this title." [Tex. Fam. Code Ann.] § 109.002(b) . . . . An order granting habeas corpus relief is not an appealable order. *See Nydegger v. Breig*, 740 S.W.2d 551, 552 (Tex. App.— San Antonio 1987, no writ) (per curiam) (noting that "granting or denying of a writ of habeas corpus is not one of those [orders] listed [that may be appealed]"). This is because habeas proceedings may not be used to litigate modification of custody orders. *See In re Lau*, 89 S.W.3d 757, 758 (Tex. App.—Houston [1st Dist.] 2002, [orig. proceeding]); *see also In re Williams*, No. 06-03-00038-CV, 2003 WL 1193044, at *1 (Tex. App.—Texarkana Mar. 14, 2003, [orig. proceeding])

30

(mem. op.) (same). The intent of habeas corpus is to compel obedience to existing orders, not relitigate the award of custody. *See Saucier v. Pena*, 559 S.W.2d 654, 656 (Tex. 1977) [(orig. proceeding)].

*In re M.M.E.*, No. 13-14-00326-CV, 2014 WL 5314498, at \*1 (Tex. App.—Corpus Christi–Edinburg Oct. 14, 2014, no pet.) (mem. op.). An order granting a petition for writ of habeas corpus may be challenged by mandamus. *Id.* at \*2.

Part of the reason that we detailed the history of the issue before the trial court is to show how Wife repeatedly asked the trial court to view its email as some type of order impacting the decree. The trial court repeatedly rebuffed Wife's efforts and was explicit in categorizing the email that it had sent the parties as a ruling on the habeas petition and its question of which parent was entitled to possession of the children. We have no jurisdiction to review on appeal the trial court's order that explicitly stated that it was a ruling on a petition for writ of habeas corpus, and Wife offers no persuasive reason how we could.[5] By the same token, we cannot rule in an appeal on Wife's contention that the trial court erred by not holding an *evidentiary* hearing on the

---

[5]In her reply brief, Wife argues that the trial court mischaracterized its corrected order because it is actually a clarification and not an order of possession. The fact remains that the trial court explicitly stated that it was ruling on the habeas petition. Further, the affidavit filed in support of the petition raised the issue of whether the alternating weekly schedule remained in effect after Husband had possession of the children during spring break. The corrected order explains the trial court's construction of the decree to resolve the question of possession raised in the petition as to which parent had possession of the children during the week after spring break. Even if the corrected order were not an approximate resolution of the habeas petition, Wife does not explain why that issue of whether the corrected order was erroneous should not have been raised by mandamus as it would be a challenge to the ruling on the habeas. Wife raised no challenge to the order by mandamus, and we cannot review an order ruling on the habeas petition by appeal.

31

petition for writ of habeas corpus; that is an issue tied to determination of the habeas petition and thus is reviewable by mandamus, not appeal. Accordingly, we lack jurisdiction over Wife's first subissue in her third issue.

### 3. We reject Wife's second subissue.

We also struggle to understand Wife's second subissue under her third issue. The argument is a tangle of statements regarding procedural history and the recitation of facts that appears to be more of an attack on how the trial court structured visitation than a challenge to any particular language in the decree. But construing Wife's argument liberally, we interpret it to be that the decree is ambiguous and should have been clarified. That argument is made in one conclusory paragraph buried in the argument. We agree with Husband that the decree does not contain the ambiguity that Wife hints that it does.

The only legal authority cited in Wife's second subissue is Section 153.256 of the Family Code, which establishes the factors that a trial court should consider when entering a possession order "other than a standard possession order." *See* Tex. Fam. Code Ann. § 153.256. Wife simply quotes the section and never tells us how it applies to her argument.

Wife then launches into a disjointed discussion that describes the chain of events leading up to Husband's filing of his petition for writ of habeas corpus, why she argued to the trial court that it was unfair that the weekly-possession schedule did not restart after Husband's spring-break possession of the children—statements that

she made in her response to Husband's habeas petition—and why she needed extended periods of possession to accommodate taking the children to Japan.

Within this argument, the only thing that Wife explicitly says about the divorce decree is that

> [t]he [f]inal [d]ecree does not contain language that weekly periods of possession continue to be calculated when factoring holiday possession into the possession calendar. The [f]inal [d]ecree provides for holiday periods of possession, "notwithstanding" the parties['] alternating weekly periods of possession. The [f]inal [d]ecree does not contain any language that the holiday time periods overlay or supersede the alternating weekly periods of possession for the parties. [Record references omitted.]

Wife concludes her argument by listing what she apparently contends are the errors that were committed by the trial court and how we should address them:

> The trial court erred by not incorporating it's [sic] clarifying ruling for possession and access into the [f]inal [d]ecree of [d]ivorce.
>
> The trial court erred by incorporating the terms of it's [sic] clarification ruling into the [c]orrected [o]rder on [p]etition for [h]abeas without an evidentiary hearing[] and against Wife's filed [o]bjection to [e]x[ p]arte [r]elief for [h]abeas.
>
> The Second Court of Appeals should reverse and remand the case back to the trial court to add clarifications for possession and access to the [f]inal [d]ecree and for the trial court to dissolve the [o]rder on [h]abeas [c]orpus.

We are at a loss to understand why Wife presents many of the facts set out in her argument. She tells us of her ties to Japan but raises no issue that the overall visitation schedule set out in the decree was an abuse of discretion. She attacks the trial court for not holding an evidentiary hearing on Husband's petition for writ of

habeas corpus and not incorporating the court's email into the habeas order but again does not tell us how we have jurisdiction to review the trial court's action with respect to the habeas petition or what factual issues required an evidentiary hearing.

Instead, the only argument that appears relevant to a subissue that we glean from Wife's brief is her challenge to the language of the decree, but that argument is merely Wife's conclusion that the decree "does not contain any language that the holiday time periods overlay or supersede the alternating weekly periods of possession for the parties." She cites us to no authority to support her contention and makes no contextual examination of the decree's provisions.

Coaxing what we can from the argument, we view Wife's complaint as being that the decree is not specific enough to answer the question in the following scenario: If Husband has possession of the children the week before spring break and then, under the terms of the decree, has possession of the children for spring break, does he also have possession the week after spring break because it is the next alternating week on the calendar from the week prior to spring break?

As we have noted, the decree provides for alternating weekly possession beginning on a date certain. Then, in the section dealing with holiday and spring-break possession, the decree provides that "[n]otwithstanding the alternating weekly periods of possession, [Wife] and [Husband] shall have the right to possession of the children as follows: . . . Spring Vacation in Even-Numbered Years—In even-numbered years, [Husband] shall have the right to possession of the children . . . ."

34

A trial court may clarify a decree when it concludes "that the order is not specific enough to be enforced by contempt." Tex. Fam. Code Ann. § 157.421(a). But we disagree that this decree requires clarification. The decree does not suggest that the clock resets after spring break; instead, the general provision for alternating weeks carries on after vacations and holidays. Indeed, this is the construction argued for by Husband in his brief as follows:

> When used as a preposition, as it is here, "notwithstanding" means "in spite of; without being opposed or prevented by"; "Despite; in spite of." *Notwithstanding*, dictionary.com (2022); *Notwithstanding*, Black's Law Dictionary (11th ed. 2019). Thus, despite or in spite of the alternating weekly possession, or without being opposed or prevented by the alternating weekly possession, the parties shall have holiday possession times. The use of "notwithstanding" directly refutes Wife's argument, and the possession schedule does not contain any conflicts as Wife asserts.

Also, the holiday and spring-break schedule in the decree has periods of possession for other holidays that are not as clearly defined as the spring-break period. Constantly restarting the alternating-week clock based on indefinite holiday time periods seems a recipe for chaos on deciding which parent is entitled to possession under the alternating-week schedule. Thus, what we glean to be the foundation of Wife's argument—that the decree required clarification and that it was error for the trial court not to provide it—is unsupported by the conclusory argument that she makes.

Again, the trial court did not view its actions as a clarification of an ambiguity in the decree. The trial court's own words were that it did not view its email as "chang[ing] the order at all."

We overrule the second subissue in Wife's third issue, which is the only part of her third issue that we have jurisdiction to decide.

### D. We reject Wife's claims that the trial court erred by failing to award her attorney's fees.

In her fourth issue, Wife argues that the trial court should have rendered judgment against Husband for the attorney's fees that she incurred in the divorce action. Wife's amended petition for divorce sought attorney's fees "[t]o effect an equitable division of the estate of the parties and as a part of the division, and for services rendered in connection with conservatorship and support of the children." The trial court's decree provided that each party would pay his or her own attorney's fees. The trial court's amended findings of fact and conclusions of law addressed attorney's fees as follows:

> As to the attorney's fees sought, no evidence was presented that supports [Wife's] position that the attorney's fees incurred were incurred for the safety and welfare of the children. Attorneys for both parties testified that the attorney's fees incurred were reasonable and necessary. The [c]ourt, consistent with the premarital agreement, awarded each party the attorney's fees incurred by [him or her].

To challenge the trial court's refusal to award fees, Wife first argues that the provisions of the parties' premarital agreement provided for a fee recovery. It did not. Next, she argues that two provisions of the Family Code authorize the recovery, but

36

she does not establish how the trial court's denial of her fee recovery runs afoul of the discretion that the provisions vest in the trial court.

 **1. We reject Wife's claim that the trial court erred by failing to award her fees under the provision of the parties' premarital agreement.**

Both parties agree that in the context of this appeal, a contract may authorize an award of fees; the contract at issue here is the premarital agreement. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006) (stating that fee claim must be supported by statute or contract); *In re Eaton*, No. 02-14-00239-CV, 2014 WL 4771608, at \*6 (Tex. App.—Fort Worth Sept. 25, 2014, orig. proceeding) (mem. op.) (holding that language of partition-and-exchange agreement precluded temporary support and award of interim attorney's fees); *Kendrick v. Seibert*, 439 S.W.3d 408, 411 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (permitting fee claim based on provision of agreed divorce decree).

Also parties may contract on broad matters in a premarital agreement. *See* Tex. Fam. Code Ann. § 4.003(a)(8) ("The parties to a premarital agreement may contract with respect to . . . any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty."). Thus, though we ultimately hold that the premarital agreement in this case did not provide for a fee recovery, we agree that the recovery of fees by one spouse against another is a matter that may be addressed in a premarital agreement.

Wife claims that the premarital agreement permitted her to recover fees for Husband's breach of his handwritten agreement with respect to the SoFi loan. We have already held that Husband did not breach that agreement. Even if we were wrong in that holding, the premarital agreement still does not permit a fee recovery by Wife.

The standard rules of contract interpretation apply to the construction of a premarital agreement. Generally, in Texas, courts interpret premarital agreements like other written contracts. *Donnelly v. Donnelly*, No. 14-21-00592-CV, 2022 WL 7188634, at *6 (Tex. App.—Houston [14th Dist.] Oct. 13, 2022, no pet.) (mem. op.) (citing *Beck v. Beck*, 814 S.W.2d 745, 748–49 (Tex. 1991)). In interpreting a written contract, the primary concern of the court is to ascertain the true intentions of the parties, as expressed in the instrument. *Id.* (citing *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996) (op. on reh'g)).

With respect to the premarital agreement, its overarching provision regarding attorney's fees—rather than providing for the recovery of fees—prohibits their recovery:

> If our marriage is dissolved, or we become legally separated, or otherwise cause our marriage to be dissolved or annulled, each of us forever waives, renounces, and releases any right either of us may have to claim or seek from the other any form of alimony, spousal support, property, remuneration, attorneys' fees, or costs, except as otherwise provided in this Agreement.

38

As noted, the trial court, "consistent with the premarital agreement, awarded each party the attorney's fees incurred by [him or her]."

But no matter the prohibition on a fee recovery in the premarital agreement, Wife persists by arguing that more specific provisions in the agreement mandate her fee recovery. First, she invokes a provision dealing with her management and control of property acquired before the marriage, which provides that

> [Wife] retains the management and control of the property belonging to [Wife] and may encumber, sell, or dispose of the property without the consent of [Husband]. This includes, but is not limited to, the right to establish a trust for a child, grandchild, or any other person. On the request of [Wife], [Husband] shall execute any instrument necessary to carry out this section. If [Husband] does not join in or execute an instrument as required by this section, [Wife] may sue for specific performance or for damages, regardless of any doctrine of spousal immunity, and[] if [Wife] is the prevailing party, [Husband] shall be responsible for [Wife's] costs, expenses, and attorneys' fees. This section shall not require [Husband] to execute a promissory note or other evidence of debt for [Wife]. If [Husband] executes a note or evidence of debt for [Wife], then [Wife] shall indemnify [Husband] from any claims or demands arising from the execution of the instrument. [Husband], by executing such instrument, shall not be entitled to indemnification under the preceding sentence if [Husband] also holds full or partial title to property used as security or collateral for such debt, unless [Husband] holds such title as an accommodation to [Wife]. Execution of an instrument shall not give [Husband] any right or interest in the property of [Wife].

Wife never tells us how a provision dealing with her control of property acquired *before* marriage applies to her claim regarding the SoFi loan that was obtained *after* the parties were married or how Husband's actions were a failure "to carry out this section." Nor can we fathom how the provision applies to our facts.

39

Next Wife turns to a provision in a section titled "Debts & Liabilities Acquired During Our Marriage," which provides that

> [i]f a debt or obligation of one of us is asserted as a claim or demand against the property of the other without the latter's written consent, whoever of us responsible for the debt or obligation shall indemnify the other from the claim or demand, including the latter party's costs, expenses, and attorney's fees.

In a vague argument, Wife contends that

> [i]n the instant case, the court failed to confirm . . . Husband's debt owed to Wife and also therefore disregarded the terms of the premarital agreement in error. This failed analysis[] denied . . . Wife her contractually agreed right that . . . Husband would indemnify her. Therefore, the court also erred in failing to award . . . Wife attorney's fees in accordance with the terms of the undisputed premarital agreement[.] Had the trial court abided by these terms of the [p]remarital [a]greement, it would have agreed that Husband should pay for . . . Wife's debt or obligation including attorney's fees based on Husband's actions in the case.

This argument sidesteps the preliminary question for application of the quoted provision: How was a claim or demand asserted against Wife's property when the SoFi loan was apparently voluntarily paid during marriage and when no claim for payment of the loan was ever asserted against her property?

Husband's brief explains the contorted interpretation that the provision would have to receive to support Wife's argument. In Husband's view, Wife "attempts to use this provision by arguing that Husband had a debt to Wife and that she made the claim on Husband, so Husband should have paid the debt[;] and because he did not, he owes her attorney's fees." Husband goes on to explain that if he

40

owed a debt to Wife by "tak[ing] the debt," which the trial court expressly rejected, then the "debt or obligation" would be Husband's debt or obligation. Wife, as the creditor, could then assert a claim or demand to collect that debt, but the terms of the premarital agreement require the creditor to assert the claim "against the property of the other," i.e.[,] Wife's property. So Wife would have to try to collect on the debt Husband owed her by collecting against her own property, and without her own consent, before Husband would be required to indemnify her against her own claim and pay her attorney's fees for having to go through that.

This is the only scenario that would allow Wife to collect attorney's fees. Not only did this scenario not happen, because Wife never made a demand against her own property to collect on the alleged debt that Husband owed her, but it never could happen. It could never happen because Wife would also be required to not consent to the creditor—herself—attempting to collect on her own property. But if Wife was the creditor, she would be the one making the demand[,] and she would be the one demanding her own property, so she would necessarily have to consent to that demand because she would be the one doing it, thus relieving Husband of his obligation to indemnify her and pay her attorney's fees. [Citations and record references omitted.]

We agree with Husband that the provision that Wife cites is incongruous with the circumstances underlying her fee claim. Thus, we conclude that the premarital agreement does not provide a contractual basis for fee recovery by her against Husband.

### 2. We reject Wife's claim that the trial court abused its discretion by failing to award her attorney's fees in accordance with provisions of the Family Code.

The statutory bases for Wife's fee claim are two provisions of the Family Code allowing for the recovery of fees—one dealing with fee recoveries in a divorce and the

41

other in a suit affecting the parent–child relationship. The trial court did not abuse its discretion by refusing to award Wife fees under these provisions.

In a divorce, the trial court may award fees under Family Code Section 6.708(c), which provides that "[i]n a suit for dissolution of a marriage, the court may award reasonable attorney's fees and expenses." Tex. Fam. Code Ann. § 6.708(c). This section vests the trial court with broad discretion in its decision regarding whether to award fees. *Seitz v. Seitz*, 608 S.W.3d 272, 279 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

With respect to a suit affecting the parent–child relationship, Section 106.002(a) provides that "[i]n a suit under this title, the court may render judgment for reasonable attorney's fees and expenses and order the judgment and post-judgment interest to be paid directly to an attorney." Tex. Fam. Code Ann. § 106.002(a). A decision to award fees under this section also falls within the trial court's discretion. *Sims v. Sims*, 623 S.W.3d 47, 66 (Tex. App.—El Paso 2021, pet. denied) (citing *Bruni v. Bruni*, 924 S.W.2d 366, 368 (Tex. 1996)).

The basis for Wife's claim is that her fees were necessary for the protection, safety, and welfare of the couple's children. Wife offers us a definition of "safety and welfare" and an explanation why that definition mandates her fee recovery:

> The terms "safety and welfare" differ from the term "best interest[,"] which is used throughout the family code to indicate that the trial court is required to make a qualitative analysis of the safety and welfare issues presented in each competing household and then arrive at which household can better meet the best interest of the child.

In the instant case, there was credible evidence of a history or pattern of drug use by Husband during the pendency of the marriage. There was also clear evidence of Husband's recently using drugs as shown by the three (3) court[-]ordered drug tests, administered during the pendency of this case, that came back positive for the presence of marijuana in Husband's system. [Record references omitted.]

Husband challenges the safety-and-welfare standard Wife proposes by arguing that it is one derived from Section 151.001 of the Family Code and not the discretionary standards of the sections relied on by Wife. *See* Tex. Fam. Code Ann. § 105.001(a) ("In a suit, the court may make a temporary order, including the modification of a prior temporary order, for the safety and welfare of the child, including an order[] . . . for payment of reasonable attorney's fees and expenses."). He again notes the premarital agreement's prohibition on the recovery of fees.

We do not reach Husband's arguments. Even if we accept Wife's safety-and-welfare standard, she does not argue that the ultimate decision to award fees is governed by anything other than the trial court's discretion. Instead, she argues Husband's conduct was so egregious that she had to seek the intervention of the trial court to protect the children and that the trial court was compelled to award her fees for that effort. The trial court, however, found "no evidence was presented that support[ed] [Wife's] position that the attorney's fees incurred were incurred for the safety and welfare of the children." The finding is an apparent rejection that Husband's conduct was so egregious that it threatened the children's health and welfare. Wife references only the alleged drug use but offers no reason why the trial

court may have erred by determining that the drug use was not of a type that threatened the safety and welfare of the children.

And Wife's argument turns a blind eye to her own conduct, such as a charge against her for family violence. With this evidence, the trial court had to balance potential safety-and-welfare concerns arising from each parent's conduct. Thus, we cannot see how the trial court abused its discretion by ordering each party to bear his or her own fees. *See In re M.B.*, No. 13-20-00061-CV, 2020 WL 7757369, at *6 (Tex. App.—Corpus Christi–Edinburg, Dec. 30, 2020, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by failing to award father fees in modification proceeding, even though evidence showed that mother had history of drug use, because Section 106.002 states that "a court *may* order reasonable and necessary attorney's fees, not that it must").

Because Wife cannot show a contractual basis supporting a fee recovery or an abuse of discretion in the trial court's decision not to award fees, we need not address her argument that the fees she proved up were reasonable and necessary.[6] *See* Tex. R. App. P. 47.1.

We overrule Wife's fourth issue.

---

[6]Wife's reply brief addresses the fee issue but only to the extent of arguing that her proof of the amount of fees owed was sufficient; she did not assert new arguments dealing with the bases for her fee claim.

44

## IV. Conclusion

Having overruled Wife's four issues, we affirm the final decree of divorce.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: January 26, 2023